Slip Op. 09-96

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CATFISH FARMERS OF AMERICA, | |
| Plaintiffs, | Before: Leo M. Gordon, Judge |
| v. | Consol. Court No. 08-00111 |
| UNITED STATES, | |
| Defendant. | |

**OPINION and ORDER**

[Commerce's administrative review results remanded.]

Dated: September 14, 2009

Akin, Gump, Strauss, Hauer & Feld, LLP (Valerie A. Slater, Christopher D. Priddy, Jaehong D. Park, Jarrod M. Goldfeder, Natalya D. Dobrowolsky) for Plaintiffs Catfish Farmers of America, America's Catch, Consolidated Catfish Companies, LLC, d/b/a Country Select Fish, Delta Pride Catfish Inc., Harvest Select Catfish Inc., Heartland Catfish Company, Pride of the Pond, Simmons Farm Raised Catfish, Inc., and Southern Pride Catfish Company, LLC.

Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, Franklin E. White, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Richard P. Schroeder); and Office of Chief Counsel for Import Administration, U.S. Department of Commerce (David W. Richardson), of counsel, for Defendant United States.

Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP (Mark E. Pardo, Andrew T. Schutz) for Defendant-Intervenors QVD Food Co., Ltd. and QVD USA, LLC.

Arent Fox LLP (John M. Gurley, Matthew L. Kanna, Diana Dimitriuc-Quaia) for Defendant-Intervenors East Seafoods Joint Venture Co., Ltd. and Piazza's Seaford World LLC.

Gordon, Judge:  This consolidated action involves an administrative review conducted by the U.S. Department of Commerce ("Commerce") of the antidumping duty order covering certain frozen fish fillets from the Socialist Republic of Vietnam.

 See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam, 73 Fed. Reg.

15,479 (Dep't of Commerce Mar. 24, 2007) (final results of administrative review), as

amended, 73 Fed. Reg. 47,885 (Dep't of Commerce Aug. 15, 2008) ("Final Results");

see also Issues and Decision Memorandum for Certain Frozen Fish Fillets from the

Socialist Republic of Vietnam, A-552-801 (Mar. 17, 2008), available at

http://ia.ita.doc.gov/frn/summary/vietnam/E8-5889-1.pdf (last visited Sept. 14, 2009)

("Decision Memorandum").   Before the court are motions for judgment on the agency

record filed by QVD Food Co. ("QVD"), and Catfish Farmers of America, and individual

U.S. catfish processors, America's Catch, Consolidated Catfish Companies, LLC, d/b/a

Country Select Fish, Delta Pride Catfish Inc., Harvest Select Catfish Inc., Heartland

Catfish Company, Pride of the Pond, Simmons Farm Raised Catfish, Inc., and Southern

Pride Catfish Company, LLC (collectively "Catfish Farmers"). The court has jurisdiction

pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C.

§ 1516a(a)(2)(B)(iii) (2006),[1] and 28 U.S.C. § 1581(c) (2006).  For the reasons set forth

below, the court remands this action to Commerce to reconsider (1) QVD's international

freight expense, (2) the valuation of QVD's labels, and (3) the calculation of the

surrogate value for fish oil.  The court sustains Commerce's determinations regarding all

other issues in this action.

### Standard of Review

       For  administrative  reviews  of  antidumping  duty  orders,  the  court  sustains

---

[1] Further citations to the Tariff Act of 1930 are to the relevant provisions of Title 19 of
the U.S. Code, 2006 edition.

Commerce's determinations, findings, or conclusions unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing substantial evidence challenges to Commerce's actions, the court assesses whether the agency action is "unreasonable" given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350-51 (Fed.Cir.2006); see Dorbest Ltd. v. United States, 30 CIT 1671, 1675-76, 462 F. Supp. 2d 1262, 1269-70 (2006) (providing comprehensive explanation of standard of review in non-market economy context).  Often described as "such relevant evidence as a reasonable mind might accept as adequate to support [the agency's] conclusion," Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938), "substantial evidence" is best understood as a word formula connoting reasonableness review.  3 Charles H. Koch, Jr., Administrative Law and Practice § 10.3[1] (2d ed. 2008). When addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record."  Edward D. Re., Bernard J. Babb, and Susan M. Koplin, 8 West's Fed. Forms, National Courts § 13342 (2d ed. 2009).

        The administrative record for an antidumping duty administrative review may support two or more reasonable, though inconsistent, determinations on a given issue. Therefore, arguments (like some made in this case) that "substantial record evidence" supports an alternative determination to the one the agency reached are not responsive to the standard of review.  The question the court must consider is whether the choice

the agency made is reasonable, not whether some alternative may also have constituted a reasonable choice.

## Discussion

### 1. QVD's International Freight Expense

In the <u>Final Results</u> Commerce calculated the net price for QVD's U.S. sales by subtracting a gross-weight, international freight expense. <u>See</u> Decision Memorandum at 23. Although Commerce stated that its practice was to subtract international freight based on the manner in which it was incurred, after reviewing Catfish Farmers' arguments, Commerce agrees that it must reconsider its calculation of international freight expense and requests a remand to do so, which the court will grant. <u>SKF USA Inc. v. United States</u>, 254 F.3d 1022, 1029-30 (Fed. Cir. 2001) ("<u>SKF</u>").

### 2. Valuation of QVD's Labels

In the <u>Final Results</u> Commerce used the average of the 2004 UN COMTRAD data covering imports of labels into Bangladesh from all over the world to value QVD's label factor of production. <u>See</u> Surrogate Value Mem. at 8; Decision Memorandum at 25. QVD argues that although the UN COMTRAD data is an appropriate basis upon which to derive a surrogate value for labels, there are three data points in the dataset for Japan, Hong Kong, and the Netherlands that should be excluded because they represent aberrationally high prices with low volumes. QVD Br. in Support of Pl.'s Mot. for J. Agency R. 15-19 ("QVD's Br."). Commerce agrees that the issue needs to be further explored and requests a remand to reconsider the application of its aberrational

outlier policy to the label surrogate value data, a request the court will grant. SKF, 254 F.3d at 1029-30.

### 3. Valuation of Fish Oil

In the Final Results Commerce relied upon World Trade Atlas Indian Import statistics for HTS subheading 1504.20 (Fish Oil, Not Fish Liver) to value the fish oil produced as a by-product of fish processing.    Decision Memorandum at 42. Catfish Farmers argue that Commerce had previously declined to use this data in the investigation and did not explain why it was appropriate to use the data in this administrative review.  Catfish Farmers Mem. in Support of Pl.'s Mot. for J. Agency R. 39-40 ("Catfish Farmers Br.").   Commerce acknowledges that it did not address this argument in the Final Results and requests a remand to reconsider the surrogate value for fish oil and address Catfish Farmers' argument, a request the court will grant. SKF, 254 F.3d at 1029-30.

### 4. Bona Fide Sales of East Sea Seafoods' Subject Merchandise

To derive the United States price for respondent East Sea Seafoods Joint Venture Co. ("ESS"), Commerce used the price between ESS's affiliated company Piazza's Seafood World LLC ("PSW") and unaffiliated United States customers. See Decision Memorandum at 39 & n.33, Pub. Doc. 256.[2]  After explaining in detail each of the arguments raised by Catfish Farmers that ESS's sales were not bona fide commercial transactions, Commerce concluded:

---

[2] Documents in the administrative record are identified as either "Pub. Doc." (for a public document) or "Confid. Doc." (for a confidential document),  followed by the document number.

We have analyzed all of the information on the record with respect to the question of whether ESS's sales during the POR constitute bona fide sales. Although we have some concerns about certain aspects of the facts on the record, a review of the totality of the circumstances leads us to conclude that sales of ESS's product are bona fide transactions. In determining whether a sale is a bona fide commercial transaction, the Department examines the totality of the circumstances of the sale in question. If the weight of the evidence indicates that a sale is not typical of a company's normal business practices, the sale is not consistent with good business practices, or "the transaction has been so artificially structured as to be commercially unreasonable," the Department finds that it is not a bona fide commercial transaction and must be excluded from review. See Certain Cut-to-Length Carbon Steel Plate from Romania: Notice of Rescission of Antidumping Duty Administrative Review, 63 FR 47232, 47234 (September 4, 1998).

In particular, in determining whether a U.S. sale, in the context of a review, is a bona fide transaction, the Department considers numerous factors, with no single factor being dispositive, in order to assess the totality of the circumstances surrounding the sale in question. The Department considers such factors as (1) the timing of the sale, (2) the sales price and quantity, (3) the expenses arising from the sales transaction, (4) whether the sale was sold to the customer at a loss, and (5) whether the sales transaction between the exporter and customer was executed at arm's length. See American Silicon Technologies v. United States, 110 F. Supp. 2d 992, 996 (CIT 2000) (citation omitted); see also Tianjin Tiancheng Pharmaceutical Co. Ltd. v. United States, 366 F. Supp. 2d 1246, 1250 (CIT 2005). An examination of whether a sale is a bona fide transaction may include a variety of these and other factors, depending upon the unique circumstances of each case.

In examining all of the information on the record in this case, we have determined that the concerns raised by the Petitioners do not cause us to reject the commercial reasonableness of ESS's U.S. sale. In the instant case, we have examined the pricing concerns of the Petitioners and find that information on the record, including price lists and average POR prices, indicate that ESS's sale was not priced aberrationally high. We have also analyzed the quantity of the sale, and have determined that it was of a commercial quantity because it was consistent in size with other sales of seafood products that PSW made during the POR. We disagree with the Petitioners that the fact that ESS does not produce a catalog, website or did not actively seek out U.S. customers during the POR, necessitates a conclusion that any U.S. sale it enters into is not legitimate. Also, the tolling arrangement does not, on its face, lead us to conclude

that the operation was not a legitimate commercial enterprise because tolling arrangement [sic] are often part of a legitimate business enterprise. We also cannot conclude that the timing of the sale results in a finding that the sales are not bona fide because companies can make a sale at any time during the POR. When viewing the totality of the circumstances, concerning all the facts and arguments placed on the record by parties, we conclude that we cannot determine ESS's sales to be non-bona fide. Therefore, we will continue to calculate a margin for ESS in these final results.

Decision Memorandum at 39.

Catfish Farmers argue that Commerce's "determination regarding [ESS] was not supported by substantial evidence because it failed to provide a reasoned and adequate explanation for its conclusion that ESS's U.S. sales were bona fide." Catfish Farmers Br. 16. Catfish Farmers argue that Commerce "failed to address the detailed record evidence, argument, and precedent relevant to the bona fides of [ESS] itself, and was unsupported by substantial evidence." Catfish Farmers Br. 13.

Although Commerce's double negative conclusion that it "cannot determine ESS's sales to be non-bona fide" lacks a certain clarity, the court nevertheless does not agree that a remand is necessary for a further explanation about the bona fides of ESS's U.S. sales. During the administrative review, Commerce first explained, and then applied, its totality of the circumstances bona fide sales test. As Commerce explained, Commerce considers numerous factors (with no single factor being dispositive), to assess the totality of the circumstances surrounding the sale in question. Commerce considers such factors as (1) the timing of the sale, (2) the sales price and quantity, (3) the expenses arising from the sales transaction, (4) whether the sale was sold to the customer at a loss, and (5) whether the sales transaction between the exporter and

customer was executed at arm's length. See Am. Silicon Tech. v. United States, 24 CIT 612, 616, 110 F. Supp. 2d 992, 996 (2000) (citation omitted); see also Tianjin Tiancheng Pharm. Co.. v. United States, 29 CIT 256, 260, 366 F. Supp. 2d 1246, 1250 (2005).  An examination of whether a sale is a bona fide transaction may include a variety of these and other factors, depending upon the circumstances of each case. If the weight of the evidence indicates that a sale is not typical of a company's normal business practices, the sale is not consistent with good business practices, or the transaction has been so artificially structured as to be commercially unreasonable, Commerce excludes the non-bona fide transaction from review.

In response to Catfish Farmers' arguments that ESS's U.S. sales were not bona fide, Commerce analyzed ESS's U.S. sale and found that the sale was not priced aberrationally high and was made in commercial quantities.  Commerce also concluded that ESS's lack of a website, catalog, or U.S. sales solicitations during the period of review did not, in and of themselves, mean that the U.S. sale was unreliable. Commerce likewise found that ESS's tolling arrangement did not, on its face, suggest an illegitimate commercial enterprise because tolling arrangements are often part of legitimate business enterprises.  These are all reasonable findings and conclusions supported by the administrative record.  When measured against Commerce's totality of the circumstances bona fide sales analysis, Commerce's conclusion regarding the bona fides of ESS's U.S. sale is reasonable.

Turning to Catfish Farmers' arguments about the bona fides of ESS itself, Catfish Farmers argue that Commerce did not directly address that contention in its

totality of circumstances bona fide sales determination, and that Commerce therefore "entirely failed to consider an important aspect of the problem," <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983).  Catfish Farmers chose to subsume the bona fides of ESS within the bona fide sales argument, rendering the bona fides of ESS one of many factors for Commerce to consider.  <u>See</u> Catfish Admin. Case Br. 42-59, Confid. Doc. 89.   What Commerce did in resolving the bona fide U.S. <u>sales</u> issue was to focus on ESS's affiliated company <u>sale</u> and subsequent <u>sales</u> to unaffiliated U.S. customers.   Commerce followed its usual practice of evaluating the totality of the circumstances with regard to those <u>sales</u>.  Commerce was persuaded that the <u>sales</u> were legitimate, and by implication, that ESS was too.  See <u>Daewoo Elecs. v. Int'l Union</u>, 6 F.3d 1511, 1520 (Fed. Cir. 1993) ("'The specific determination we make is whether the evidence and reasonable inferences from the record support' Commerce's findings.") (quoting <u>Matsushita Elec. Indus. Co. v. United States</u>, 750 F.2d 927, 933 (Fed. Cir. 1984)).  The court does not believe Commerce erred by failing to separately and distinctly address the legitimacy of ESS as a respondent when Catfish Farmers did not raise that as a separate, standalone issue.  It was argued within the context of Commerce's totality of the circumstances sales test.  The court therefore does not share Catfish Farmers' belief that a remand is either necessary or appropriate in this instance. Commerce's bona fide sales determination was reasonable and therefore is sustained.

### 5. Collapsing Thuan Hung with QVD and QVD Dong Thap

In the <u>Final Results</u> Commerce collapsed Thuan Hung with QVD and QVD Dong Thap, as it had in the preceding review.  Decision Memorandum at 19.  QVD claims that

other than a family relationship there is no evidence of financial ties or transactions that would support a determination to collapse Thuan Hung with QVD and QVD Dong Thap. QVD Br. 4.  Commerce placed the memorandum from the second administrative review addressing the affiliation and collapsing of the QVD companies on the record of this administrative review.  See Second Review Collapsing Memorandum, Confid. Doc. 37 ("Collapsing Memorandum").  In its supplemental questionnaire Commerce asked QVD to indicate whether the facts had changed since the preceding review period.  Decision Memorandum at 18.  In response QVD represented that "there were no changes in the corporate structures of any of the QVD companies or affiliates" and there "were no changes from the 2nd administrative review to the capital structure, scope of operations, affiliations, production capacity, ownership, or management."  Id. at 19 (internal quotations omitted).    Accordingly, relying upon the rationale of the second administrative review, and "absent any information that would change that determination," Commerce again collapsed Thuan Hung with QVD and QVD Dong Thap. Id. at 19.

If parties are affiliated or collapsed, Commerce generally disregards transactions between those parties and looks further downstream for transactions.  For example, for export or constructed export price, Commerce looks downstream to find the first sale to an unaffiliated purchaser.  19 U.S.C. § 1677a(a), (b).  In the administrative review Commerce found that Thuan Hung was part of the QVD family group, a determination that QVD does not challenge.  QVD Br. 10.  Rather, QVD asserts that Commerce's

collapsing analysis was improper because there was not a significant potential for manipulation by the collapsed entities.  QVD Br. 14.

Commerce collapses affiliated parties and treats them as a single entity if (1) "those producers have production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities" and (2) "the Secretary concludes that there is a significant potential for the manipulation of price or production."  19 C.F.R. § 351.401(f)(2) (2006).[3]  The regulations further provide a non-exhaustive list of three factors that Commerce may consider in determining whether there is a significant potential for manipulation: (1) the level of common ownership; (2) the extent to which managerial employees or board members of one firm sit on the board of directors of an affiliated firm; and (3) whether operations are intertwined.  Id.

QVD does not dispute that Thuan Hung has production facilities that can produce and did produce, during the period of review, products similar or identical to the subject merchandise.   However, QVD disputes Commerce's determination that there is a significant potential for manipulation of prices and production.  QVD Br. 8.

With regard to the first control factor, common ownership, Commerce found, in the second review, that the QVD family members "comprise the only shareholders and the largest share holders as a family in each company" and that, as a result, the QVD family companies have the ability or incentive to coordinate their actions in order to direct the companies to act in concert with each other.   Collapsing Memorandum

---

[3] Further citations to the C.F.R. are to the 2006 edition.

at 15-16.  This finding was incorporated into the <u>Final Results</u> in this review, along with the other second administrative review findings on this issue.  Decision Memorandum at 19.

QVD argues that common family ownership is not sufficient to collapse companies without further indicia of control.  QVD Br. 10 (citing <u>Certain Welded Carbon Steel Pipes and Tubes from Thailand</u>, 63 Fed. Reg. 55,578 (Dep't of Commerce Oct. 16, 1998) (final results of antidumping duty administrative review) ("<u>Tubes from Thailand</u>")).   QVD is correct that common family ownership alone provides an insufficient basis to collapse entities, but QVD's analysis of <u>Tubes from Thailand</u> is incomplete.   Rather, <u>Tubes from Thailand</u> supports Commerce's determination that, from a family group perspective, the ownership of Thuan Hung is a positive indicator of the significant potential for manipulation.  In <u>Tubes from Thailand</u> Commerce decided not to collapse one company into the others, finding that the family in question was only a minority owner.  <u>Tubes from Thailand</u>, 63 Fed. Reg. at 55,583.  In the instant case the existence of the family group, and the significant controlling ownership by the family members, reasonably supports Commerce's collapsing decision.

With regard to the second control factor, the extent to which managerial employees or board members of one firm sit on the board of directors of an affiliated firm, Commerce found that, because senior leadership positions of each of the QVD companies were filled with members of the QVD family, and the QVD family members are the largest stakeholders in the company, the evidence "clearly shows that the family has the ability and financial incentive to coordinate their actions to direct . . .

[the companies] . . . to act in concert with each other." Collapsing Memorandum at 16;

see Statement of Administrative Action of the Uruguay Round Agreements Act ("SAA"),

H.R. Doc. 103-316 (Vol. I) at 838 ("A company may be in a position to exercise restraint

or direction, for example, through corporate or family groupings.").

QVD argues that this control factor requires overlapping boards of directors.

QVD Br. 11.   QVD is incorrect.   There is no applicable precedent that requires

overlapping boards of directors to support a collapsing determination.  The regulation's

list of factors is non-exhaustive and merely suggests three factors for Commerce to

examine in establishing potential control.  See 19 C.F.R. § 351.401(f)(2).  Commerce

made a family group determination that QVD does not contest.  Here, Commerce

reasonably applied the control analysis to the family group level because the companies

are owned and controlled by family members.  Accordingly, although Thuan Hung does

not share board members with the other QVD companies, the presence of members of

the QVD family group in senior leadership positions in all of the QVD companies

supports a finding that there is a significant potential for manipulation.

With regard to the third control factor, intertwined operations, Commerce relied

upon several facts.  In the second review, Commerce found that Thuan Hung had a

past arrangement with QVD and QVD Dong Thap to process frozen fish fillets for export

to the United States.  Decision Memorandum at 19; Collapsing Memorandum at 15-16.

Commerce acknowledged that the arrangement had ended in 2003, but, in the second

review, Commerce continued to find that the past arrangement evidenced the potential

for intertwined operations in the future.  Collapsing Memorandum at 16.  Commerce,

however, did not rely upon this fact alone in making its determination.   In addition, Commerce found that Thuan Hung processed Vietnamese catfish like the subject merchandise and that Thuan Hung had an import-export registration so that it could export to the United States if it wanted to.  Id.  As a result, Commerce found a potential for intertwined transactions that, when combined with the family group determination, and the level of ownership and direct control by family members of the QVD companies, supported a determination that Thuan Hung should be collapsed with QVD and QVD Dong Thap.  Id. at 16.  After confirming that there were no major changes to the underlying data from the prior review, Commerce concluded that it was appropriate in this review to continue to treat QVD Dong Thap and Thuan Hung as a single entity. Decision Memorandum at 19.

QVD cites to three administrative determinations in which Commerce found that there was insufficient evidence of intertwined operations to support a collapsing determination.  QVD Br. 12-13.  Two of the determinations do not involve family group findings and, therefore, are inapplicable.   The administrative precedent that does address a family group scenario, Tubes from Thailand, supports Commerce's collapsing decision in this action, because the evidence that Commerce found missing in Tubes from Thailand is present here.   In Tubes from Thailand Commerce based its decision not to collapse upon the totality of the circumstances, including determinations that the family member on the board of the company in question was only one of nine, and that the family in that case owned a minority share of the company in question.  In contrast, here, Commerce found that the QVD family members are the only shareholders,

the largest shareholders, and hold senior leadership positions in the companies. Collapsing Memorandum at 15-16.

In addition Commerce found that Thuan Hung processed fish fillets for the QVD companies in the past; that it processed fish identical to the subject merchandise during the period of review; that it has an import-export registration; and that, although it shipped no subject merchandise during the period of review, it could have done so. Further, QVD focuses a great deal upon its contention that the companies did not share customers and customer lists, make production decisions in conjunction with each other, coordinate pricing, borrow or lend to each other, or engage in similar joint activities.  QVD Br. 5-6.  The regulation, however, covers not just actual manipulation, but also whether there is a significant <u>potential for manipulation of price and production in the future</u>.  19 C.F.R. § 351.401(f)(1).

As with any collapsing determination, Commerce's determination here was dependent upon the totality of the facts and circumstances.  Commerce reasonably determined that there existed a significant potential for manipulation of price and production by the collapsed entities.  Commerce's collapsing decision is therefore sustained.

### 6. Affiliation of QVD USA and Beaver Street Fisheries

In the <u>Final Results</u> Commerce rejected Catfish Farmers' argument that QVD USA and Beaver Street Fisheries ("BSF") were affiliated because they shared an employee.  Catfish Farmers contend that Commerce failed to evaluate whether BSF and QVD USA were affiliated because they both employ Person X, or whether BSF

directly or indirectly controlled QVD USA through Person X.  Catfish Farmers Br. 21-24.

Contrary to Catfish Farmers' assertions, Commerce was aware of their arguments,

restated those arguments, and rejected those arguments.  Commerce examined the

relationship between QVD USA, BSF, and Person X, and determined that the record

evidence did not reveal the type of control necessary to warrant a finding that QVD USA

and BSF were affiliated.  Decision Memorandum at 15-16.  The antidumping statute

provides that, among other scenarios, an affiliation relationship exists when two or more

persons directly or indirectly control, are controlled by, or are under common control

with, any person.  19 U.S.C. § 1677(33)(F).  The statute defines the "control of another

person" as being "legally or operationally in a position to exercise restraint or direction

over the other person."  19 U.S.C. § 1677(33).

In the <u>Final Results</u> Commerce concluded that "[w]hile Person X acts as

QVD USA's agent in the United States and is also employed by BSF, there is no

evidence on the record to indicate that QVD USA or BSF are in a legal or operational

position to exercise restraint or direction over each other, or that they are under

common control of Person X. Decision Memorandum at 15-16.  Commerce determined

that QVD does not control BSF through Person X, and BSF does not control QVD USA

through Person X.  Commerce found that although Person X has some influence over

the prices of QVD USA, the owner of QVD (not Person X), has the ultimate authority to

set QVD USA's prices.  QVD USA Verification Report at 5-6, Confid. Doc. 86.

With respect to BSF, Commerce found that Person X had no control over the

purchasing decisions of BSF.  <u>Id.</u>  Commerce found that BSF employed Person X as

one of many advisors about fish market conditions, production facilities, or exporter information.  Id.  Given Person X's role for the respective companies, Commerce found the record evidence insufficient to support a finding that BSF controlled, or was in a position to control, QVD USA through Person X.  These are reasonable findings supported by the administrative record.

Catfish Farmers argue that BSF allegedly "controls" Person X through their employer-employee relationship, and because Person X allegedly was operationally able to exercise restraint and direction over QVD USA, BSF could indirectly exercise control over QVD USA through Person X.  Commerce, though, did not agree, finding as a factual matter that Person X simply was not a vehicle through which either company could exercise control over one another.  See Hontex Enter., Inc. v. United States, 27 CIT 272, 299, 248 F. Supp. 2d 1323, 1345-46 (2003) ("At no point does the evidence demonstrate that [the shared employee] was in control of both Companies or that his activities served to allow one company or any third party to exercise control over the Companies. The evidence merely demonstrates that the Companies shared an employee and nothing more.").  Here, Commerce conducted a full control analysis of the relationships between QVD USA, BSF, and their shared employee, Person X, and found that the requisite statutory control was absent, a finding that is reasonable given the role that Person X played in each company.

### 7. Surrogate Value Selections for Whole Live Fish and Financial Ratios

Catfish Farmers challenge (1) the surrogate value Commerce used to value the primary input, whole live fish, for the subject merchandise, frozen fish fillets, and

(2) the surrogate financial statements Commerce used to value the financial ratios for selling, general, and administrative expenses, overhead, and profit.   Catfish Farmers Br. 24-35.

In an antidumping proceeding Commerce is required to determine whether subject merchandise is being, or is likely to be, sold at less than fair value in the United States by comparing the export price (the price of the goods sold in the United States) and the normal value of merchandise.   19 U.S.C. § 1675(a)(2)(A).   The normal value of merchandise is usually determined by reference to sales of merchandise in the home market, in a third country, or through a constructed value of the merchandise. See 19 U.S.C. § 1677b(a)(1), (4).

Under Commerce's non-market economy methodology for determining normal value, Commerce determines a surrogate value for each input used in producing subject merchandise.   19 U.S.C. § 1677b(c)(1).   "[T]he factors of production utilized in producing merchandise include, but are not limited to – (A) hours of labor required, (B) quantities of raw materials employed, (C) amounts of energy and other utilities consumed, and (D) representative capital cost, including depreciation."   19 U.S.C. § 1677b(c)(3).

When constructing the value for subject merchandise in a non-market economy, Commerce need not "duplicate the exact production experience of the" non-market economy manufacturers, or undergo an item-by-item accounting when accounting for factory overhead.   Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1377 (Fed. Cir. 1999).   Rather, Commerce must use the best available information to "acquire

an accurate reading of the actual costs of a company operating in a state-controlled-economy." Technoimportexport and Peer Bearing Co. v. United States, 15 CIT 250, 254, 766 F. Supp. 1169, 1174 (1991).

### A. Fish Prices from 2006-07 Financial Statement for Gachihata Acquaculture Farms, Ltd.

For the Final Results Commerce had a choice of several proposed sources for surrogate value information for the whole live fish used to make the subject merchandise, frozen fish fillets.  Commerce obtained a surrogate value for whole live fish from the 2006-07 audited financial statement for Bangladeshi fish grower Gachihata Acquaculture Farms, Ltd. ("Gachihata").   Decision Memorandum at 13-14. Catfish Farmers argue that this financial statement is unreliable and that Commerce should have continued to use the sales data from the 2000-01 Gachihata statement, indexed for inflation.  Catfish Farmers Br. 6-13.  Although styled as an argument that Commerce failed to consider their arguments and offer a rational connection between the facts found and the choice made, Plaintiffs' argument reads more like a garden variety request to reweigh the evidence, something the substantial evidence standard of review does not allow.

In selecting among competing surrogate value sources, Commerce evaluates potential data for reliability, availability, quality, specificity, and contemporaneity. See Preliminary Determination of Sales at Less Than Fair Value and Postponement of the Final Determination: Magnesium Metal from the People's Republic of China, 69 Fed. Reg. 59,187, 59,195 (Dep't of Commerce Oct. 4, 2004) ("Magnesium Metal from China").

The sales data from Gachihata's 2006-07 financial statement is publicly available; contemporaneous with the period of review; derived from the primary surrogate country, Bangladesh; concerns the specific type of whole live catfish used to produce the subject merchandise; and is an audited financial statement, and, thus, reliable. <u>See</u> QVD Surrogate Value Submission Ex. 6 (Oct. 30, 2007), Pub. Doc. 210. Commerce selected the 2006-07 financial statement over the 2000-01 financial statement because the 2006-07 financial statement data was contemporaneous with the period of review and specific to the input. Decision Memorandum at 13.

Catfish Farmers argue that the 2006-07 Gachihata financial statement allegedly is unreliable because: (1) the underlying data is unreliable; (2) Gachihata did not show a profit for that period; (3) there was an irregularity regarding the valuation of biological assets of the firm; (4) the auditors' report accompanying Gachihata's financial statement was marked private and confidential and, therefore, not publicly available; and (5) the financial statement was missing some pages. Catfish Farmers Br. 6-13. None of these challenges provides a basis for remanding this issue to Commerce for further consideration.

First, Catfish Farmers assert that the data from the 2006-07 Gachihata financial statement is unreliable because it is based upon sales of six metric tons of fish, which Catfish Farmers contend is a "commercially insignificant" quantity. Catfish Farmers Br. 9. Catfish Farmers also claim that Commerce failed to address the commercial quantities issue in its decision. However, Commerce expressly noted that Catfish

Farmers had raised that argument.   Decision Memorandum at 12.   Commerce was simply not persuaded.

Specifically, Catfish Farmers failed to demonstrate on the administrative record that six metric tons is a commercially insignificant quantity.   Catfish Farmers claim through bare assertion and a hoped for inference that because Gachihata's 2006-07 sales were significantly less than Gachihata's 2000-01 sales, the 2006-07 quantity must be commercially insignificant.   Catfish Farmers Br. 9.   It does not follow, however, that because sales during the earlier period were significantly higher than sales during the later period, the later sales were not made in commercial quantities.   Catfish Farmers hoped Commerce would infer that the 2006-07 sales were not made in commercial quantities, but Commerce did not oblige.   Catfish Farmers now invite the court to draw that inference in the first instance, something the court will not do given the record before the court.

Catfish Farmers also attempt to support its argument by asserting that, according to the 2006-07 financial statement, Gachihata did not produce any subject merchandise in 2005-06.   Catfish Farmers Br. 19.   This merely demonstrates that commercial quantities were not produced in 2005-06.   That fact, however, does not provide any basis for a determination that the six metric tons at issue here was a commercially insignificant quantity.

Second, Catfish Farmers argue that Commerce's reliance upon the 2006-07 Gachihata financial statement was inconsistent with Commerce's policy that financial statements from surrogate companies with no profit will not be used as a source of

financial ratios.  Catfish Farmers Br. 10 (citing <u>Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam: Final Results of the First Antidumping Duty Administrative Review and First New Shipper Review</u>, 72 Fed. Reg. 52,052 (Dep't of Commerce Sept. 12, 2007) ("<u>Shrimp from Vietnam</u>") & accompanying Decision Memorandum at 6).

Catfish Farmers misunderstand Commerce's policy.  In <u>Shrimp from Vietnam</u> Commerce announced a clarification of its practice with regard to obtaining surrogate financial ratios for the selling, general, and administrative ("SG&A") expenses, and overhead for a factors-of-production-normal-value calculation.  Decision Memorandum at 9.  In that proceeding, Commerce decided that profit was a function of total expenses and, therefore, intrinsically tied to the other financial ratios.  <u>Id.</u> at 10.  As a result, using other financial ratios from a financial statement with no profit renders those other financial ratios unrepresentative of a normal surrogate producer.  <u>Id.</u>  Therefore, Commerce decided that it would not use the financial ratios from a financial statement if the company has no profit.  <u>Id.</u>

The rationale for not using financial ratios from statements where a company has no profit does not extend to the price the company received for a quantity of fish it sold, which is determined by the market for fish.  Whether or not the company made an overall profit, the revenue and quantity of the sales of fish are market prices and quantities reflected in the audited financial statement.  These values are not a function of interconnected accounting principles, as are financial ratios.  Therefore, while Commerce will understandably reject the use of no-profit statements for purposes of

determining surrogate financial ratios, it reasonably may use data from such statement to value individual material inputs that are recorded in the financial statement.   Third, Catfish Farmers allege that the 2006-07 Gachihata financial statement indicates that the valuation of the biological assets of the firm, which includes the fish, had not been recognized during the period.   Catfish Farmers Br. 11.   Catfish Farmers contend that this alleged irregularity provides a basis to reject the use of the fish price data. Catfish Farmers Br. 11.

However, there is no basis upon which to make a negative inference about the prices at which Gachihata sold fish based upon the company's policy regarding the biological asset values for accounting purposes.   The auditors' report sets forth a reasonable explanation for not valuing the biological assets of the firm during the period of review.   See QVD Surrogate Value Submission Ex. 5.   There is nothing on the record that indicates that Gachihata's policy was implemented in bad faith, or that it had an impact upon the actual prices and quantities of the fish sold.   Commerce acted reasonably when it accepted Gachihata's 2006-07 financial statement.

Fourth, Catfish Farmers argue that because the auditors' report was marked private and confidential, it should be rejected.   Catfish Farmers Br. 11-12. Catfish Farmers assert that because the auditors' report was not "publicly available," Commerce violated its preference for publicly available data.   However, Commerce made an appropriate judgment call to accept the auditors' designation of its report as private and confidential.

The relevant fact is that the financial statement, and thus the fish price used, was publicly available.  It is only the auditors' report that was kept confidential.  However, the parties were able to examine and comment extensively upon the auditors' report because it was placed on the record.  Decision Memorandum at 13.  After reviewing all of the arguments, Commerce found that nothing in the auditors' report impugned the 2006-07 fish values.  Id.  This is a reasonable finding supported by the record.

Fifth, Catfish Farmers argue Commerce failed to address Catfish Farmers' arguments that the 2006-07 Gachihata financial statement was incomplete and should have rejected it upon that basis.  Catfish Farmers Br. 12.  However, Commerce specifically addressed that concern:

> As noted above, [Catfish Farmers] also argue that certain pages (cover page, table of contents, page numbers, publication date, etc.) and other sections typically found in the prior review reports are missing from the 2006-2007 financial statement.  Although we agree . . . that the 2006-2007 financial statements do not contain certain pages and information found in previous reports, we cannot speculate as to the reason for their omission here.  More importantly, we do not find these pages necessary for our analysis, as previously those pages have not contained any relevant information regarding Gachihata's [fish] value.

Decision Memorandum at 14.

In Commerce's view the omissions were not substantial and did not undermine the integrity of the sales price data.  Catfish Farmers have not demonstrated that the omissions are significant.  They merely argue that pages are missing and that the financial statement is unreliable.  Although the information may not have been perfect, Commerce reasonably chose to rely upon it.  Where Commerce is faced with the choice of selecting from among imperfect alternatives, it has the discretion to select the best

available information for a surrogate value so long as its decision is reasonable. "The Court's role . . . is not to evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." Goldlink Indus. Co. v. United States, 30 CIT 616, 619, 431 F. Supp. 2d 1323, 1327 (2006). Here, Commerce satisfied that test.

## B. Financial Ratios

In the Final Results Commerce used the financial statements for Bangladeshi seafood processors Apex Foods Ltd. and Gemini Sea Food Ltd. ("Gemini"), but not Bionic Seafood Exports Ltd. ("Bionic") to derive the fish processing companies' surrogate financial ratios for:  (1) SG&A, (2) overhead, and (3) profit.  Decision Memorandum at 6-8.  Catfish Farmers argue that Commerce should have used Bionic's financial statement because:  (1) Commerce's new policy of not using financial statements from companies that have a zero profit is not supported by the evidence; (2) Commerce's rejection of financial statements with no profit contradicts past precedent, including Commerce's use of Bionic's financial statements in all previous administrative reviews; and (3) Commerce did not provide the parties adequate notice or an opportunity for comment upon the new practice.  Catfish Farmers Br. 24-32. Catfish Farmers also argue that Commerce should not have used the Gemini financial statement because the financial statement indicates that Gemini received a subsidy. Catfish Farmers Br. 32-35.

Before selecting among competing surrogate value sources for the respondents' factor inputs, Commerce, in accordance with its normal practice, evaluates record data for reliability, availability, quality, specificity, and contemporaneity.   See Magnesium Metal from China, 69 Fed. Reg. at 59,195.   There is no dispute that both the Bionic and Gemini financial statements are publically available, contemporaneous with the period of review, specific to fish processors, and from the primary surrogate country, Bangladesh.  Thus, Commerce was required to exercise its judgment in choosing which financial statement to use.

## 1.  Bionic

Commerce reasonably determined not to use Bionic's financial statement because the company did not show a profit.  Decision Memorandum at 6.  As noted in Section 7A, supra, Commerce determined that, for purposes of obtaining financial ratios, it will not rely upon financial statements that have zero profit.   Decision Memorandum at 6 (citing Shrimp from Vietnam, 72 Fed. Reg. at 52,052 & accompanying Decision Memorandum at 8-10 (Cmt. 2B)).   Commerce relied on its determination in Shrimp from Vietnam where it explained that the financial ratios are not preferred data, in that they do not reflect the financial situation of a normal surrogate company that operates at a profit and, thus, are not an appropriate benchmark for the calculation of normal value in a non-market economy case, when other financial statements, showing profits, are available.    As a result, Commerce found that "use of the parts of a financial statement for a zero profit company does not account for the interconnectedness of the overhead, SG&A, with the zero profit."  Shrimp from Vietnam

Decision Memorandum at 10.  Here, in the <u>Final Results</u>, Commerce adopted the rationale from <u>Shrimp from Vietnam</u> and disregarded Bionic's financial statements in calculating surrogate financial ratios.  Decision Memorandum at 6.

Catfish Farmers argue that Commerce's new policy is unreasonable because it means that Commerce would use a financial statement for a company that made a $1.00 profit but not that for a company which made a $1.00 loss.  Catfish Farmers Br. 27.  Commerce, however, has not yet faced either factual scenario, so it is speculation upon the part of Catfish Farmers as to what Commerce would do in such a situation.  If such circumstances arise, Commerce can address them based upon the record before it at that time.

Catfish Farmers argue that the new policy is inconsistent with past precedent. Catfish Farmers Br. 28-29.  In both the <u>Final Results</u> here, and <u>Shrimp from Vietnam</u>, Commerce explicitly acknowledged that, in the past, Commerce had taken inconsistent positions with regard to financial statements with zero profits.  Decision Memorandum at 6; <u>Shrimp from Vietnam</u>, 72 Fed. Reg. 52,052 & accompanying Decision Memorandum at 9.  However, a past inconsistent practice is not a basis for overturning a new practice designed to eliminate the inconsistency and provide certainty going forward.

Catfish Farmers rely upon <u>Fuyao Glass Indus. Group Co. v. United States</u>, 27 CIT 1892 (2003) ("<u>Fuyao</u>") and <u>Rhodia, Inc. v. United States</u>, 26 CIT 1107, 240 F. Supp. 2d 1247 (2002) ("<u>Rhodia</u>"), for the proposition that the Court of International Trade has consistently upheld Commerce decisions to use financial

statements of companies with zero profits.  Catfish Farmers Br. 28-29.  Catfish Farmers

though misstate the holdings in those cases.  Those cases stand for the proposition that

Commerce may exclude zero profit figures from its profit calculations.

Fuyao, 27 CIT at 1212-13; Rhodia, 26 CIT at 115, 240 F. Supp. 2d. at 1255.  These

cases did not address the issue of whether Commerce should use the selling, general,

and administrative expenses, and overhead expenses reflected in financial statements

of companies with zero profits.  Further, Fuyao does not indicate, as Catfish Farmers

argue, that the "mere fact that a company is unprofitable does not indicate that the

overhead or SG&A expenses are somehow tainted."  Catfish Farmers Br. 29.

     Catfish Farmers next argue that Commerce changed its practice without giving

notice or opportunity to comment.  Catfish Farmers Br. 29.  Assuming arguendo that

prior notice is somehow required for a change of this type of administrative practice,

Catfish Farmers were well aware of the change. Specifically, Commerce announced its

new policy of excluding zero profit financial statements in Shrimp from Vietnam,

72 Fed. Reg. 52,052 & accompanying Decision Memorandum at 9-10.  The effective

date of the final results in that case was September 12, 2007.  The effective date for the

Preliminary Results in the underlying review was September 19, 2007.  More important,

in this administrative review, the parties had the opportunity to comment upon the issue

of excluding zero profit financial statements from financial ratio calculations, and took

advantage of that opportunity.   See Catfish Farmers Admin. Case Br. 7-8,

Confid. Doc. 89; QVD Admin. Rebuttal Br. 5-8, Confid. Doc. 91.  Indeed, Shrimp from

Vietnam was published more than three months before case briefs were due in this

review on December 28, 2007.   Thus, Catfish Farmers had sufficient notice of the

change in policy, and Commerce's rejection of Bionic's financial statement is a

reasonable determination supported by the administrative record.

### 2. Gemini

In the <u>Final Results</u> Commerce included data from the 2005-06 Gemini financial

statement in its calculation of the financial ratios for normal value because the data was

the best available information.   Decision Memorandum at 7-8.   Catfish Farmers assert

Commerce should not have used the data because there allegedly is a reason to

believe or suspect that the company had received a subsidy.   Catfish Farmers

Br. 32-35.   One of the criteria to determine what is the best available information in

valuing the factors of production is whether there is a reason to believe or suspect that

prices being used may be dumped or subsidized prices.   Omnibus Trade and

Competitiveness Act of 1988, H.R. Rep. No. 100-576, at 590 (1988) (Conf. Rep.),

<u>as reprinted in</u> 1988 U.S.C.C.A.N. 1547, 1623.   The Conference Report explains that a

formal countervailing duty investigation is not required in making the determination, and

that Commerce should base its decision upon the available record evidence.   <u>Id.</u>

at 1623-24.   Congress provided no further guidance as to what would constitute a

reasonable basis to believe or suspect that a price may be subsidized.

Here, Commerce explained that a mere mention, in a financial statement, that a

subsidy was received, does not necessarily mean that a countervailable subsidy exists.

Decision Memorandum at 7.   Commerce carefully reviewed that mention and concluded

that there was insufficient record evidence to support a finding that Gemini received a

countervailable subsidy.  Decision Memorandum at 7-8.  Although Catfish Farmers may disagree with Commerce's conclusion, and may have even reached a different conclusion were they the decision maker, Commerce's conclusion was reasonable and, therefore, must be sustained.

Catfish Farmers argue that the financial statement indicates that Gemini had received from the government of Bangladesh "a 10% [c]ash subsidy as per Bangladesh Bank Circular No. FE-23 dated 12/12/03 against export bill, which was made available to Bangladeshi processing and exporting companies."   Catfish Farmers Br. 33.  Commerce refused to indulge Catfish Farmers' hoped for inferences and assumptions about this particular quotation.  Commerce did not believe it was reasonable to infer that the amount identified as a "subsidy" was from the government of Bangladesh.  The financial statement merely reflects information from a Bangladesh Bank circular about a "subsidy."   The record does not explain to which bank Gemini's financial statement is referring and contains no evidence that the "subsidy" is from a state bank.  Similarly, even if the "subsidy" were identified as being from the Bangladeshi government or other public entity, there is no record evidence that identifies the terms of the alleged program (for example, whether it is only on exports, who is eligible, or whether it is a specific subsidy).

Catfish Farmers also assert that the subsidy is for "processing and exporting companies."  Catfish Farmers Br. 33.  However, other than the notations in Gemini's financial statement that the alleged "subsidy" was "against export" and "against export bill," there is no indication that the "subsidy" only applies to exports.  QVD Surrogate

Value Submission Ex. 7 at 19, 21 (May 14, 2007), Pub. Doc. 127.  Commerce's refusal to share the inferences drawn by Catfish Farmers is reasonable on this administrative record, which contained a mere mention of a subsidy without additional substantiating evidence of countervailability.  As a result, Commerce's determination is sustained.

## Conclusion

Commerce's request for a voluntary remand regarding (1) QVD's international freight expense, (2) the valuation of QVD's labels, and (3) the calculation of the surrogate value for fish oil is granted.  All other issues raised by Catfish Farmers and QVD in their motions for judgment on the agency record are denied.  Accordingly, it is hereby

**ORDERED** that this action is remanded to the U.S. Department of Commerce to reconsider its calculation of QVD's international freight expense, the valuation of QVD's labels, and the valuation of fish oil; and it is further

**ORDERED** that the U.S. Department of Commerce is to file its remand results on or before November 10, 2009; and it is further

**ORDERED** that the parties are to file a proposed scheduling order with page limits for the submission of comments on the remand results, if applicable, not later than 14 days after Commerce files the remand results with the court.


                                                    /s/ Leo M. Gordon
                                                  Judge Leo M. Gordon


Dated: September 14, 2009
       New York, New York

## NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____        By: _____
                                                                            Deputy Clerk